FILED
2019 Sep-09  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA


# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

KELLIE G. SMITH.                    )
                                    )
                    Plaintiff,      )
                                    )
 VS.                                ) CASE NO. 2:19-cv-01357-RDP
                                    )
                                    )
THE BORAD OF TRUSTEES OF            )
THE UNIVERSITY OF ALABAMA,          )
THE UNIVERSITY OF ALABAMA           )
HOSPITAL,                           )
                                    )
                                    )
                    Defendants.     )

## AMENDED COMPLAINT

### Parties

1. Plaintiff, Kellie G. Smith, (hereinafter referred to as "Smith") an African-American female, is of sound mind, over the age of nineteen (19) years and at all times relevant hereto, was a resident of the Northern District of Alabama, Southern Division.

2. The Defendant, The Board of Trustees of the University of Alabama, is a state governmental entity, governing and overseeing the operation of three, 4 year post-secondary educational institutions, including Smith's employer, the University of Alabama at Birmingham, Health System. The Defendant is organized

and operated pursuant to the laws of the State of Alabama, as mandated and chartered by the Alabama State Legislature and at all time relevant hereto was the employer of Smith.

3. The Defendant, the University of Alabama Hospital, (hereinafter referred to as "UAB") which is owned and operated by the Defendant, The Board of Trustees of the University of Alabama,  is a non-profit organization organized and operated pursuant to the laws of the State of Alabama, and at all time relevant hereto was the employer of Smith.

## Jurisdiction

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1333, 1343(d), 1343(4) and 2201; 42 U.S.C. §§ 1981, 1981a, 1983, 2000e *et seq.* and the Fifth and Fourteenth Amendments to the United States Constitution.  The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights secured by the above statutes, providing for injunctive and other relief against discrimination based on race.

5.  The Plaintiff has fulfilled all conditions precedent to the institution of this action pursuant to 42 U.S.C. Section 2000e *et seq.* She timely filed her charge of discrimination within One-Hundred and Eighty (180) days of occurrence of the last discriminatory act.  She timely files this complaint within Ninety (90) days of the receipt of her Right-to-Sue letter received from the Equal Employment

Opportunity Commission on May 28, 2019. The Notice-of-Right to sue is attached to the complaint.

## Venue

6. At all times relevant hereto The Defendants were and are located and doing business in the Northern District of Alabama, Southern Division. All actions complained of occurred within said district and division, making venue proper pursuant to 28 U.S.C § 1391 (b)

## Factual Allegations

7. Smith was hired by UAB in approximately 2011 as a Care Manager in the Department of Care Transitions. From her hire date until September 2017, Smith had no disciplinary issues, no work performance issues and all her performance appraisals had been good.

8. In approximately June 2016 Alison Garretson was hired by UAB as Executive Director of the Department of Care Transitions.

9. At that time Smith was acting as a co-interim Director of care transition.

10. Garretson divided the positions into a Director's position for outpatient care and a Director's position for inpatient care.

11. Smith interviewed for the Director's position for in-patient care and Garretson appointed her to the position in February 2017.

12. The Director's position for out-patient was not filled by Garretson until December 2017, when Garretson chose Heather Bradley, a white female, for this position.

13. Upon her hire, Garretson immediately began a number of new initiatives, to attempt to speed-up and streamline the discharge process for in-patient hospital patients and to decrease readmission rates for patients recently discharged.

14. Garretson placed the accomplishment of these initiatives and goals on Smith.

15. Garretson gave Smith no direction, plan guidance or suggestions as to how to meet these goals.

16. Garretson set unsubstantiated and arbitrary deadlines, initiatives and goals for Smith and her department to meet.

17. The criteria used to set and meet these goals were / are called metrics.

18. The Case Management Department had metrics based on regulatory guidelines, but the department's performance had never been measured or evaluated against those metrics.

**The software issues**

19. Garretson directed Smith to use a software program called "CT Dashboard" to track and monitor the criteria patients needed to meet to be discharged and when recently discharged patients were readmitted.

20. This was a software program that Garretson had direct UAB's internal IT Department to develop that was supposed to interact with medical records software.

21. The 2 software programs were not compatible.

22. As a result, much of the actions that were being performed by Smith and her team were not being "captured" and reported by these software programs.

23. This made it appear as though Smith and her team were not making what Garretson considered to be "sufficient progress" on some of the goals and initiatives.

24. Smith continually worked with and consulted with UAB's internal IT department to reconcile the software programs.

25. Smith was ultimately informed that there was nothing the IT department could do, because of the way the CT Dashboard program had been designed.

**Smith's additional duties and responsibilities**

26. As a result of these new initiatives and goals as described above, Smith had to;

A. Develop new policies and procedures to implement the initiatives to reach the goals set by Garretson;

B. Create and develop new positions;

C. Hire staff to fill these positions;

D. Train both the existing staff and new staff as to the new policies and procedures as well as how to use the new and existing software programs.

E. When the multiple issues arose regarding the incompatibility of the software programs as described above, Garretson assigned Smith the responsibility to attempt to resolve those issues, even though these issues were under the control of departments and employees outside Smith's authority.

27. Garretson provided no guidance, assistance or suggestions to assist Smith with any of Smith added responsibilities as described above.

28. Smith complained to Garretson multiple times that she was overworked and understaffed and that the goals and deadlines Garretson had set were unrealistic.

29. Garretson ignored her.

**Interference and impediment**

30    Garretson actively and intentionally interfered with Smith and impeded her in the performance of her job, including, but not limited to:

31.  Garretson reassigned Smith's administrative assistant to herself;

32.  Garretson implemented 4 staff meetings a day.

33.  Staff from other departments stopped participating; stating that 4 meetings in a day were a waste of time. Other departments stopped attending one of the meetings. Care Management staff did not have consistent attendance in all meetings and stated that so many meetings took away from productive time.

34.  The meetings were abandoned.

35.  Garretson required Smith to attend all staff evaluations when her subordinate supervisors were evaluating their staff.

36.  When Smith attempted to delegate some of these duties and responsibilities, Garretson refused.

37. Smith developed and submitted multiple training and education plans for her employees to Garretson, who systematically rejected them.

38. Garretson did not specifically identify her objections, nor provide any assistance, suggestions or guidance as to what the plans should be.

39. Dr. Kellie Flood requested that Smith prepare a summary of the work Smith and her department were doing with regards to speeding up and streamlining the discharge process and to decrease readmission rates for presentation to other physicians.

40. Smith solicited input and information from the Center for Patient Flow (CPF) and Nursing departments, completed the summary and presented it to the directors of those departments, who thought it was very good.

41. When Garretson reviewed it she informed Smith "this not what I wanted".

42. Smith re-worked the summary several times, soliciting input from employees in the CPF and Nursing departments.

43. Each time, Garretson rejected the summary.

44. Smith and the employees from the other departments were confused as to exactly what Garretson wanted in the summary, but Garretson could not or would not convey that information to them.

**Communication**

45. Garretson would meet with Smith's peers and communicate with them and other employees in other departments regarding the initiatives and goals without informing Smith.

46. When Smith would then communicate with these individuals to obtain information or updates, they would tell Smith they had already passed that information to Garretson.

47.  Garretson would schedule meetings for Smith and not inform her of the topic(s) for the meetings, which would cause Smith to appear for the meetings unprepared.

48. A. Dr. Kellie Flood requested that Smith prepare a summary of the work Smith and her department were doing with regards to speeding up and streamlining the discharge process and to decrease readmission rates for presentation to other physicians.

B.  Smith solicited input and information from the CPF and Nursing departments, completed the summary and presented it to the directors of those departments, who thought it was very good.

C.  When Garretson reviewed it she informed Smith "this not what I wanted".

D.  Smith re-worked the summary several times, soliciting input from employees in the IT and Nursing departments.

E. Each time, Garretson rejected the summary.

F.  Smith and the employees from the other departments were confused as to exactly what Garretson wanted in the summary, but Garretson could not or would not convey that information to them.

**Turnover**

49. Garretson's conduct caused a large amount of turnover in Smith's department.

50. Garretson began requiring employees to work on weekends and holidays;

51. Garretson implemented 4 staff meetings a day.

52. Staff from other departments stopped participating, stating that so meetings in a day were a waste of time.

53. The meetings were abandoned.

54. Staff complained on numerous occasions to Smith that Garretson was making changes to work flow without understanding the programs and the work flow pattern, which caused more work for the staff.

55. The staff would complain to Garretson, but she ignored them.

56. Smith also passed along these complaints to Garretson, who ignored them.

57. Garretson would inappropriately criticize employees in front of other employees.

58. Garretson forced several of the members of Smith's team to quit or take a lesser position under threat of termination.

59. All these employees were African-American.

60. Garretson's conduct caused a turnover rate in Smith's department of 22-33%, which directly impeded Smith's ability to meet the goals and initiatives Garretson had set.

61. A staff doctor observed and commented to Garretson and Smith that Smith's department was underperforming in part due to being understaffed.

62. The doctor also noted the department was underperforming because their patient burden suffered from psychosocial issues and had medically complex, multiple issues with little to no social support system.

63. Many of these patients were severely and / or chronically ill and waiting on a bed at a nursing home of rehab hospital, which made discharging them in accordance with Garretson's initiatives and goals unreasonable and improbable.

64. These issues impeded any ability to discharge these patients by and artificially set deadline of 20 days.

65. Further, if these patients were discharged before medically ready, readmission within a short period of time was inevitable.

66. These were medical issues over which Smith had no control.

67. Garretson disagreed with this assessment, however, could offer no assistance, suggestions or help in resolving these issues.

**Smith is held accountable for performance by other departments**

68. Progress on the initiatives and goals set by Garretson were dependent on the performance of other departments outside of Smith's control, of which Garretson was aware.

69. Smith was in need of information regarding the CT Dashboard software program and other software programs Garretson had directed Smith to use to implement the initiatives and reach the goals Garretson had set.

70. Garretson would not provide any information or assistance in obtaining this information.

71. Smith had to consult other departments to obtain such information and assistance.

72. Smith continually worked with and consulted with UAB's internal IT department to reconcile incompatible soft ware programs.

73.  Smith was ultimately informed that there was nothing the IT department could do, because of the way the CT Dashboard program had been designed by that department.

74. There was a need within the Nursing Department for nursing staff to update estimated discharge times in patients' medical records so that Smith's department would have current information in planning a patient's discharge.

75. Garretson implemented 4 staff meetings a day.

76. Staff from other departments stopped participating; stating that so 4 meetings in a day were a waste of time.

77. The meetings were abandoned.

78. A staff doctor noted Smith's department was underperforming because their patient burden suffered from psychosocial issues and had medically complex, multiple issues with little to no social support system.

79. Many of these patients were severely and / or chronically ill and waiting on a bed at a nursing home of rehab hospital, which made discharging them in accordance with Garretson's initiatives and goals unreasonable and improbable.

80. These issues impeded any ability to discharge these patients by an artificially set deadline of 20 days.

81. Further, if these patients were discharged before medically ready, readmission within a short period of time was inevitable.

82. These were medical issues over which Smith had no control.

**<u>January 2018 Performance Improvement Plan</u>**

83. As a result of the above conduct by Garretson, Garretson placed Smith on a performance improvement plan in 2018 to "support the concerns and deficiencies as noted in 2017 annual performance review".

84. As noted above "the concerns and deficiencies" noted by Garretson in her 2017 annual performance review of Smith were concerns and deficiencies

created by Garretson in an effort to make it impossible for Smith to accomplish and achieve the initiatives and goals Garretson had set forth.

### First Written Counseling

85. On April 23, 2018 Garretson issued Smith an 'Employee Conference Memorandum / Written Counseling " detailing Smith's unsatisfactory performance which included the issues described above:

      A. Lack of sufficient number of staff meetings;

      B. inability to obtain and review data and present a summary to Garretson;

      C. Insufficient staff to meet key metrics.

86. Garretson noted that Smith and her department were making progress towards the initiatives and goals Garretson had set.

87. Smiths (again) noted to Garretson that she did not have confidence in the data provided by the software programs Garretson had directed her to use.

88. Despite the above, Garretson stated that she had lost confidence in Smith's ability to conduct proactive planning, forward thinking and organization for goal achievement and to meet deadlines.

89. Garretson suggested that Smith accept a demotion to a supervisor's position, which Smith refused.

### Second Written Counseling

90. On September 13, 2018 Garretson issued Smith a second 'Employee Conference Memorandum / Written Counseling" detailing Smith's unsatisfactory performance which included the issues described above:

A. Failure to reduce the length of stay of the top 20 patients by 10%.

B. Smith completed a checklist for directors to create a process using another software program to track criteria for patients to be discharged, as a part of the effort to reduce the length of stay of the top 20 patients by 10%.

C. Smith created the checklist, but Garretson found it "lacked clarity".

D. Smith had approved PTO on the date that Garretson subsequently set a meeting (knowing that Smith was scheduled to be off that day).

E. Smith had communicated with another management employee to cover the meeting for her, of which Garreston was aware.

F. Despite this, Garretson falsely stated in the memorandum that Smith had not arranged for coverage.

91. Garreston had knowledge of Smith's complaints and the issues Garreston had created, as described above, which directly and negatively affected Smith's performance.

92. Despite this, Garretson …"continued to have concerns about Smith's abilities to train her staff regarding new processes and her pattern of

ineffectiveness in initiating interdisciplinary team based process improvement work."

93. This comment relates back to the issues described in paragraph 46 above.

94. Garretson reported concerns by Hospitalist services regarding Smith's department being proactive.

95. This was never previously shared with Smith.

96. Smith disagreed with this concern, but also noted that due to high turnover, lack of staff, lack of approved training and education plans and an educator and incapable and incompatible software programs made it difficult for her department to meet Garreston's goals, although progress was being made.

97. Garretson reported an alleged concern by Dr. Flood that while the quality of work had improved, the ability to complete referrals prior to the patient being medically ready had not.

98. Smith agreed, but this deficiency was due to lack of staff, lack of approved training and education plans and an educator and incapable and incompatible software programs, all deficiencies Garretson had created.

99. Garretson set specific goals to be met by Smith in the memorandum.

100. Smith informed Garretson that these goals were not realistic due to lack of staff, lack of approved training and education plans and an educator and

incapable and incompatible software programs, all deficiencies Garretson had created.

101. Garretson ignored her.

**Termination**

102. On October 16, 2018 Garretson terminated Smith's employment with the Defendant.

103. Garretson stated that the progress of implementing CT Dashboard operational metrics was too slow.

104. Some of the goals had been met and there was progress on the remaining goals.

105. Smith (again) informed Garretson that the slow progress was due to conditions beyond her control: to lack of staff, lack of approved training and education plans and an educator and incapable and incompatible software programs, all deficiencies Garretson had created.

106. As to Garretson's conduct described above, such conduct was not committed against other department directors under Garreston's supervision who were white.

107. After Smith's termination, 3 existing employees were temporarily assigned to perform Smith's job.

108. Ultimately 2 individuals were permanently hired to replace Smith, both white.

## COUNT I

### Race Discrimination

### Disparate treatment-adverse employment action

109. Paragraphs One (1) through one-hundred and eight (108) are reallged and incorporated herein by reference and made paragraph one-hundred and nine (109).

110. The above-described conduct represents disparate treatment of Smith based on her race.

A. Garettson placed unreasonable and unattainable goals and performance measures on Smith that were not placed on similarly situated white employees.

B. Garettson interfered with Smith's performance of her duties without cause and then disciplined Smith for failing to perform. Garettson did not interfere with the performance of similarly-situated white employees.

111. Garretson also treated other black employees in a similar manner.

112. Ultimately, Garettson created circumstances on which to justify Smith's termination that are pretext for race discrimination

113. Smith was terminated for behavior / conduct that has been committed by similarly-situated white employees who were not terminated.

114.  As a result of the actions as described above, Smith was caused to suffer and continues to suffer humiliation, embarrassment, physical, mental and emotional anguish, loss of pay and benefits.

WHEREFORE, PREMISES CONSIDERED, Smith respectfully prays that this Honorable Court will assume jurisdiction of this action and after trial:

A.  Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the Defendants are violative of the rights of the Smith as secured by 42 U.S.C., Sections 1981, 1981a, and 2000(e) et. seq., as amended.

B.  Grant Smith a permanent injunction, enjoining the Defendants, their employees, servants, agents and those acting in concert with it and at their request from continuing to violate the above cited laws.

C.  Award Smith an appropriate amount of lost wages, benefits and interest; compensatory and punitive damages; cost of prosecuting this action and attorney's fees.

D.  Smith further prays for such other, special, additional and further relief and benefits as this Honorable Court may deem necessary and appropriate.

**PLAINTIFF DEMANDS TRIAL**

**BY STRUCK JURY.**

Respectfully Submitted,

*/s/ James M. Wooten*
JAMES M. WOOTEN
Attorney for the Plaintiff
2001 Park Place North, suite 875
Birmingham, Alabama  35203
(205) 322-7707
(205) 322-7779 *fax*
ASB-1630-O40J
jmwooten3162@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing Amended Complaint via the

Court's CM/ECF system to counsel for the Defendant on this the 9th of August, 2019 as follows:

Cary T. Wahlheim (TYN001)
General Counsel
UAB Health System
500 22nd Street South, Suite 504
Birmingham, AL 35233
(205) 975-0113
cwahlheim@uasystem.edu

- and –

David R. Mellon
University Counsel
The University of Alabama System
UAB Office of Counsel
1720 2nd Avenue South, Suite AB 820
Birmingham, AL 35294
(205) 934-3474
drmellon@uasystem.edu
Attorney for Defendant UAB Health System

*/s/ James M. Wooten*